SWEENEY v. DOUGLAS COPPER CO.

(Supreme Court, Appellate Division, First Department. March 15, 1912.)

1. SALES (§ 7*)—CONTRACT OF AGENCY.

Where the contracts between a corporation and one who sold its bonds recited that the agent agreed "to become the sole financial agent" for the company, and to pay the company a per cent. of the "par value of all bonds sold," and the company agreed to furnish the bonds "as called for by the party of the second part, in accordance with the terms" of the contract, the agreements were not contracts of sale, as there was no agreement to take and pay for any bonds, but prima facie create only a relation of principal and agent.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 16, 17; Dec. Dig. § 7;* Principal and Agent, Cent. Dig. § 10.]

2. PRINCIPAL AND AGENT (§ 23*)—CREATION OF STATUS—EVIDENCE.

In an action against a corporation to recover sums paid to its agent for its bond, evidence *held* to show that the person with whom the plaintiff dealt was an agent for the company for the sale of bonds, rather than a dealer in them.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 41; Dec. Dig. § 23.*]

3. PRINCIPAL AND AGENT (§ 23*)—CREATION OF STATUS—EVIDENCE.

Evidence, in an action to rescind a contract for the sale of a bond and for damages from a failure to deliver, *held* to sustain a finding that at the date of the sale the person selling the bond was the agent of the issuing corporation as to the particular bond.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 41; Dec. Dig. § 23.*]

4. BANKRUPTCY (§ 363*)—UNDISCLOSED PRINCIPAL—ELECTION.

Where at the time of filing a claim in bankruptcy against a fiscal agent of a corporation charged with the sale of bonds, for an amount paid for a bond which was never delivered, the claimant did not know that the person with whom he was dealing was the agent of the company, his acts will not constitute an election to pursue the agent which will preclude an action against the undisclosed principal.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 550–554; Dec. Dig. § 363.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Appellate Term.

Action by William J. Sweeney against the Douglas Copper Company. From a judgment for plaintiff, defendant appeals. Affirmed.

See, also, 130 N. Y. Supp. 1120; 145 App. Div. 922, 130 N. Y. Supp. 1132.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and MILLER, JJ.

Eaton, Lewis & Rowe (Martin L. Stover, of counsel), for appellant.

Douglas & Armitage (Archibald Douglas, of counsel, and Paul Armitage, on the brief), for respondent.

CLARKE, J. One M. L. Eldridge, 65 years of age, a resident of Davenport, Iowa, saw a copy of King's Financial Bulletin published at Boston and bearing date November 23, 1907, in which appeared a broadside entitled:

"Douglas Copper Co. bonds may be secured at 110 for one week longer but price will increase December 1st."

The article was signed by C. F. King. It stated, inter alia:

"This is the first allotment of $100,000 of these bonds and the company in giving me the exclusive right to offer them to the public is recognizing the fact that my office reaches more solid investors than any other financial house in the country. * * * These bonds are issued in three denominations, $100, $500 and $1,000 and bear interest semi-annually. * * * Holders of them will enjoy a fixed income of 6 per cent. as long as they hold them and in the year 1909 will also have the privilege of converting them into stock of the company at $10 a share. * * *"

Upon the faith of said article, Eldridge wrote to King on November 26, 1907, and by December 2d had sent to him $1,081.33 "in full for one $1,000 Douglas Copper Company bond." On January 7, 1908, King wrote to Eldridge that he found by reference to his books that he had placed an order for one 6 per cent. convertible bond:

"Delivery of this bond has been delayed for the reason that I have been engaged in negotiations for the purchase of a number of the original series A bonds of the Douglas Copper Company at a price which would enable me to sell them on the basis of 152 for each $100 bond. As these original bonds are convertible into stock of the company at par $5 per share at any time between this date and December 31, 1909, at the option of the holder, they are easily worth more than double the price of the second series for which you have subscribed and which are only convertible into stock during the year 1909 at the rate of $10 per share. I find that I shall be able to fill a limited number of orders for these original series A bonds of the Douglas Copper Company at the rate of $152 for each $100 bond and if you desire to avail yourself of the privilege of subscribing for one of these original bonds in lieu of the second series bond for which you have subscribed, I shall be glad to credit you with the amount already paid, $1,081.33, and on receipt of the difference, $438.67, will forward you one of the original series A bonds, denomination $1,000, which is convertible at your option into 200 shares of stock of the company at any time from this date until December 31, 1909."

Eldridge on January 9th accepted this suggestion and sent to King a draft for $438.67, which, added to the amount theretofore forwarded, amounted to $1,520 "in full payment of 1 of the 6 per cent. convertible bonds of the Douglas Copper Company, denomination $1,000 of the original series A, convertible at my option into 200 shares stock of the company at $5 per share at any time from this date until December 31, 1909."

Eldridge never received the bond for which he had subscribed, nor anything else, except some worthless promissory notes long after the event. King became a bankrupt and was subsequently indicted and convicted. In April, 1908, Eldridge filed a claim in bankruptcy against him which was allowed. He has not received any dividend nor is he likely to. Long after the filing of this claim in bankruptcy against King, he was advised by a firm of attorneys at Boston that he probably had a claim against the Douglas Copper Company, and thereupon, at the suggestion of these attorneys, and on March 13, 1909, Eldridge executed an assignment of his claim to one Charles H. Ryan. On April 22, 1909, said Ryan executed an assignment to "William J. Sweeney of New York in the county and state of New York" of "all the claims, demands and rights of action which, under and by virtue of an assignment to me of M. L. Eldridge dated March 13, 1909, I now have against the Douglas Copper Company."

This action was brought by said Sweeney in the City Court of New York.

The Douglas Copper Company is a foreign corporation created under the laws of the state of Maine, but its general offices are located in the city of New York. The complaint sets up the payment of $1,520 upon the date set forth to C. F. King, the duly authorized agent of the Douglas Copper Company; that said sums of money were paid to and received by the said King as agent of the Douglas Copper Company for the purchase of 1 $1,000 bond of the Douglas Copper Company, series A, at the agreed price and value of $1,520, which the said King as agent duly agreed to deliver; that in violation of said agreement the said bond was never delivered to or tendered to the said Eldridge or his assigns, nor was the equivalent thereof, $1,520, or any part thereof, returned to or tendered; and, after settling up the assignments from Eldridge to Ryan and from Ryan to Sweeney, the complaint alleges "that the plaintiff herein elects to rescind the contract made between M. L. Eldridge and the Douglas Copper Company," and, averring that he has been damaged in the sum of $1,520, demands judgment therefor. The action, therefore, is against an undisclosed principal upon a rescission for the amount paid.

Upon the trial the main question submitted to the jury was whether, at the time of the transactions complained of, King was the agent of the defendant company. The jury found a verdict for the plaintiff, and from the judgment entered thereon and from the order denying a new trial the defendant appeals.

The two questions which we deem it necessary to discuss are: First, was the evidence sufficient to support the finding of agen-

cy? And, second, was the filing and allowance of the claim in bankruptcy against the agent, King, such an election as estopped pursuit of the principal, the defendant company?

[1] Four contracts between King and the company were in evidence. The first was a letter from King dated March 25, 1905, addressed to the vice president of the Douglas Copper Company, 42 Broadway, New York:

"In accordance with memorandum governing proposition submitted to you yesterday, and your telegram of this date informing me that the same has been approved, I now submit in writing my proposition in detail, which memorandum will serve the purpose of contract between us. I agree to become sole financial agent for the Douglas Copper Company and to undertake to sell the company's six per cent. convertible bonds to the amount of $400,000 and to pay to the company a net price of eighty-five per cent. of the par value thereof for all bonds sold. I agree to undertake to sell bonds to the amount of $150,000 within four months from date of this memorandum, it being understood, however, that should I be unable to sell bonds to the full amount of the $150,000 within four months from this date, then in that case the company will provide me with bonds to be used as collateral security for the purpose of negotiating a loan for such an amount as may be required to meet the urgent demands of the treasury at the time, which, however, it is understood will be limited to an amount which may be necessary to bring the total cash receipts up to $150,000. * * * It is agreed that I may sell the bonds at such price as I may fix from time to time but that in no case will I offer through newspaper or magazine advertisement to sell the bonds at less than par. I agree to begin immediately an active campaign for the sale of these bonds. * * * In the event of my failure to sell bonds to the amount of $25,000 quarterly, * * * then in that case the company shall have the right to cancel contract—otherwise the same shall be in force in accordance with terms and conditions here agreed to until December 31st, A. D. 1906, during which period it is expressly understood that I shall be the sole and exclusive financial agent for the securities of the Douglas Copper Company," etc.

This was signed by the Douglas Copper Company by its vice president under seal, and it was authorized and ratified at a meeting of the directors of the company.

The second contract, dated August 16, 1905, stated that the company had $338,400 par value of its 6 per cent. convertible bonds which it desired to have sold "and whereas the party of the second part is in the business of dealing in investment securities and desires to undertake the sale of said bonds, * * * the party of the second part agrees to become the sole financial agent for the sale of the 6 per cent. convertible bonds of the Douglas Copper Company to the amount of $338,400 par value and to pay said company at its office in New York, at net price of 85 per cent. of the par value thereof, plus one-half of the excess price over 110 for all bonds sold," and agreed to sell and pay for said bonds in minimum amounts monthly as provided. This contract was to expire February 28, 1906.

The third contract bears date of January 3, 1906, and recites the previous contracts, makes changes therein, and substitutes a new first clause as follows:

"The party of the second part agrees to become the sole financial agent for the sale of the 6 per cent. convertible bonds of the Douglas Copper Company from date of this amended agreement to the amount of $218,900 par

value and to pay said company at its office in New York a net price of 85 per cent. of the par value thereof of all bonds sold."

There were other changes, and the contract was to terminate June 1, 1906.

The fourth contract was dated September 9, 1907, and provides:

"Whereas the party of the first part * * * is about to make a new issue of ten year six per cent. debenture bonds to the amount of $300,000, the same to be convertible into stock of the Douglas Copper Company at any time during the year 1909 at the option of the holder on the basis of $10 per share, and which issue it desires to sell: * * * The party of the second part agrees to become the sole financial agent for the sale of said issue of bonds, or so much of said issue as the party of the first part shall desire to sell * * * and said party of the second part further agrees to pay the said Douglas Copper Company at its office in New York a net price of 85 per cent. of the par value thereof for all said bonds that said party of the second part shall sell. * * * It is mutually agreed and understood by and between the parties hereto that this contract shall terminate on the 31st day of December, 1907, and that if the said party of the second part has not before that date sold all of said bonds, he shall have no right to call upon the company for any necessary balance after said date for any unsold balance after said date. * * * In further consideration of this contract, the party of the first part hereby agrees with the party of the second part to extend the convertible privilege on all bonds of a previous issue, which are at this date entitled to conversion for two years. * * * The party of the first part hereby agrees to furnish the bonds to the amount that may be agreed upon as above stated in section first, and for the price above stated, as called for by the party of the second part in accordance with the terms of this agreement."

The appellant claims that those contracts were vendor and vendee contracts and created no relation of principal and agent. In this we do not agree. Upon their face King was created the sole financial agent for the purpose of disposing of various securities which the company desired to sell. There was no obligation upon his part to take and pay for a single bond. What he agreed to do was to sell the bonds for the company. He had the privilege of advertising them for sale and of selling them. It was intended that he should initiate, and he did initiate, a financial campaign for the purpose of selling said bonds. The limitation was placed upon him that he should not sell them for less than par, and he was required to pay a net price of 85 per cent. to the company on all that he sold. The names of the purchasers of the bonds were sent by him to the company before the bonds were delivered. So that it seems to me that the relation created was that of agency.

[2] That the company took this view is illustrated by the circular sent out to its stock and bond holders, stating some general figures and information and concluding:

"In reply to many inquiries that have been received recently, the company desires to state that it has suffered no loss whatever through the failure of Mr. C. F. King and that in the future it is the purpose of the company to dispense with the services of any fiscal agent, and to communicate directly with its own security holders."

That is certainly an admission of the character of the previous relation existing between Mr. King and the company. King also sold the stock of the company on a commission. He sent in the blanks

upon which the subscriptions were made; he attended to the conversion of the bonds into stock; in fact, he did everything that a general financial agent could do between the company and his clients. The company was aware of his newspaper campaigns; it made suggestions; it received copies of his paper, complained if it did not receive them. There was abundant evidence, as it seems to me, to justify the finding of agency.

[3] It is claimed that even if it be conceded that, at the time Eldridge sent his money to King, King was the agent of the company, he was so only as to $300,000 of 6 per cent. debenture bonds which King advertised in his paper of November 23, 1907, and for one of which Eldridge originally subscribed; that his agency for the class A bonds had long since expired; that when King induced Eldridge to change his subscription to the class A bonds and send $438.67 in addition, he was acting solely on his own account; and that as the complaint counts on the class A bond no cause of action was established. We think an issue of fact was here presented; that the circular above alluded to, showing that King had been the general fiscal agent of the company, as well as that at the time of its issue $100,000 worth of class A bonds were still in the possession of the company, the testimony of King's secretary that all the kinds of securities were passing through his office in October, November, and December, 1907, as before, the testimony of the vice president of the company that there were a few "straggling orders" coming in at various times that were filled, and certain letters which show that, although the time of expiration of the class A contract had arrived, transactions in accordance therewith between King and the company still continued, and especially the letter which continued it until a three days notice of cancellation, there being no proof that said notice was ever given, constituted enough evidence to support the verdict upon this point.

[4] Second. What was the effect of the filing and allowance of the claim in bankruptcy against the agent, King?

In his dissenting opinion in Tew v. Wolfsohn, 174 N. Y. 272, 66 N. E. 934, Chief Judge Cullen said:

"The authorities differ as to what constitutes an election, and in some cases it has even been held that the recovery of a judgment against the agent, without satisfaction, will not be deemed conclusive of such election."

But there has been no difference of opinion that an election must be predicated upon full knowledge of the facts. In Sanger v. Wood, 3 Johns. Ch. 416, Chancellor Kent said:

"Any decisive act of the party, with knowledge of his rights and of the facts, determines his election in the case of conflicting and inconsistent remedies."

In Coleman v. First National Bank of Elmira, 53 N. Y. 388, Judge Andrews said:

"But one who deals with an agent is not concluded from resorting to the principal unless it distinctly appears that with full knowledge of all the facts he elected to take the sole responsibility of the agent and that he designed to abandon any claim against the principal. Thompson v. Davenport, 9 B. & C. 78."

In Remmel v. Townsend, 83 Hun, 353, 31 N. Y. Supp. 985, it was held that the act of electing between two remedies presupposes such knowledge on the part of the one performing the act that he has an opportunity of choosing which of two or more courses he will pursue, and, if he understands that there is but one course he can take, he cannot be said to have made a choice by taking such course.

In Brown v. Reiman, 48 App. Div. 295, 62 N. Y. Supp. 663, plaintiffs brought an action to recover the purchase price of two sealskin garments bought by the defendant's daughters, alleging that they were his duly authorized agents. Plaintiffs had previously obtained judgment against the daughters, who had initiated bankruptcy proceedings to rid themselves of the obligations of said judgments. It was in the course of said proceedings that evidence was given and information obtained which established the agency of the daughters. The court in affirming a judgment for the plaintiffs said:

"This being the case, the relation of principal and agent becomes established; and when it is further made to appear, as it is by the plaintiffs' testimony, that the existence of this relation was not fully disclosed until after the commencement of the bankruptcy proceedings, it cannot be said that the plaintiffs have elected to rely solely upon the responsibility of the agents, nor that they were concluded by reason of the actions which were brought against such agents from pursuing the principal when his existence became known; for it is a well-settled rule that a creditor cannot make an election either of remedies or parties without first realizing that the opportunity of exercising his preference is afforded him."

And all of the cases which have considered the question have proceeded upon the fundamental fact of the possession of full knowledge of all the facts by the person held to have elected. Cobb v. Knapp, 71 N. Y. 348, 27 Am. Rep. 51; Tuthill v. Wilson, 90 N. Y. 423; Knapp v. Simon, 96 N. Y. 284; Fowler v. Bowery Savings Bank, 113 N. Y. 450, 21 N. E. 172, 4 L. R. A. 145, 10 Am. St. Rep. 479; Conrow v. Little, 115 N. Y. 387, 22 N. E. 346, 5 L. R. A. 693; Terry v. Munger, 121 N. Y. 161, 24 N. E. 272, 8 L. R. A. 216, 18 Am. St. Rep. 803; and La Machant v. Moore, 150 N. Y. 209, 44 N. E. 770.

In the case at bar, at the time Eldridge filed his claim against King in the bankruptcy proceedings, he did not know the facts. He supposed, and testified, that he was dealing directly with King. He had no knowledge of the contracts nor the course of dealing between King and the defendant, upon the evidence of which the jury has found that the defendant was the undisclosed principal of King. Without knowledge there can be no election. Upon the facts as they appear, Eldridge was not estopped from pursuing his claim against the defendant upon discovery of the true relations existing between it and King.

The determination of the Appellate Term should be affirmed, with costs and disbursements to the respondent. All concur.